IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-003819-WJM-STV

ROCKY MOUNTAIN ASSOCIATION OF RECRUITERS,

     Plaintiff,

v.

SCOTT MOSS, in his official capacity as Director of the Division of Labor
Standards and Statistics of the Colorado Department of Labor and Employment,

     Defendant.

---

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF

---

On April 26, 2021, the Court requested supplemental briefing on three questions concerning the dormant Commerce Clause and the Law.[1]  *See* ECF 33.  Plaintiff was directed to brief what it considered to be "the most burdensome aspects of the Law," and Defendant was ordered to "explain[ ] why the specific burdens on interstate commerce identified by Plaintiff do not outweigh the local interests promoted by the Compensation Posting and Promotion Posting Requirements."  ECF 33, p. 3.  Plaintiff was also directed to file a brief "summarizing the Law's relevant legislative history," and Defendant was given the option "to respond or provide any additional legislative history for the Court's

---

[1] As in Defendant's Response to the Motion for Preliminary Injunction, Defendant will use the term the "Law" to refer collectively to the Colorado Equal Pay for Equal Work Act, §§ 8-5-101 through 8-5-203, C.R.S., and its implementing regulations found at 7 Code Colo. Regs. 1103-13.

1

consideration."  ECF 33, pp. 3-4.  Defendant's Responses to those two questions are set forth below.

### I.      Why the specific burdens on interstate commerce identified by Plaintiff do not outweigh the local interests.

#### A.      There are no specific burdens on interstate commerce identified by Plaintiff.

The Court's question can be answered very succinctly: Plaintiff has identified no specific burdens on interstate commerce, and thus has provided nothing for the Court to place on the burden side of the *Pike* balancing scale that could possibly clearly outweigh the putative local benefits.

Plaintiff has identified what it considered to be the four "most burdensome aspects of the law."  *See* ECF 35, p. 2.  And while each of these identified burdens will be considered in more detail below, it can be said generally that none of them are in fact cognizable burdens on interstate commerce.  They are instead, as Defendant has explained previously, simply operational or logistical burdens that may have an impact on a company's balance sheet but have not been shown, or even argued, to have any identifiable impact on the national labor market.  *See* ECF 23, pp. 12-18 (Defendant's Response in Opposition to Motion for Preliminary Injunction); ECF 34 (Defendant's Supplemental Brief on "The Types of Burdens That Matter Under the Dormant Commerce Clause").  Additionally, none of the four identified burdens have been argued or shown to place a greater burden on interstate commerce than is placed on intrastate commerce, and thus the identified burdens cannot outweigh the putative local benefits because Plaintiff cannot even reach the *Pike* test.  *See* ECF 23, pp. 13-14; ECF 34, pp. 11-12.

2

As a result, and as explained in Defendant's previous briefing, Plaintiff cannot prevail under *Pike* balancing because (1) it cannot even get to the balancing test, (2) it has not identified any cognizable interests to place on the "burden" side of the scale under the balancing test, and (3) even if it had, the burdens are alleged in such general terms that the Court cannot possibly conduct any sort of balancing test.

**B.    The identified burdens cannot outweigh the putative local benefits under *Pike* balancing.**

Each of the four burdens is addressed in more detail below:

**1.    "The Requirement To Post Compensation For Remote Jobs, Or Other Jobs That 'Could' Be Performed In Colorado"**

The costs described by Plaintiff in support of its argument that the requirement to post a compensation range for remote jobs are not sufficient to show a constitutional violation.  In support of its argument that this is one of the most significant burdens imposed by the Law, Plaintiff first argues that the Law would impose a significant administrative burden, explaining that it will have to determine a pay range up front without knowing a potential applicant's skills, experience, or other qualifications.  Plaintiff argues this will be time-intensive and would depend on complicated variables with respect to jobs in Colorado. Notably, Plaintiff does not cite a single case to support its arguments that these administrative burdens show a constitutional violation. [2]  ECF 35, pp. 2-5.

---

[2] For purposes of Plaintiff's First Amendment challenge, the administrative burdens of determining what salary range an employer can offer to prospective employees is not valid burden.  Instead, the issue under the First Amendment is

Plaintiff has not established that its burden regarding remote job posting is a burden that would violate the dormant Commerce Clause.  The administrative burden of posting salary ranges for remote jobs is not the type of burden that matters in dormant Commerce Clause cases.  Plaintiff's argument that some employers may potentially face administrative costs in order to comply with the Law only suggests costs to certain employers, rather than burdens on interstate markets.  *See Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127-28 (1978) (explaining the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations").  Plaintiff does not provide any evidence of how much the burden will cost, and does not allege any facts suggesting that the administrative costs would be significant.

Even if Plaintiff alleged that the Law would have "devastating economic consequences" on certain firms, it would not be sufficient to constitute a dormant Commerce Clause burden.  *See Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 827 (3d Cir. 1994) (quoting *Ford Motor Co. v. Ins. Comm'r*, 874 F.2d 926, 943 (3d Cir. 1989)) (internal quotation marks omitted).  These alleged potential administrative costs fit under the category of "possible effects on the profits of individual" firms, and such costs alone cannot support Plaintiff's argument that the Law violates the Commerce Clause.  *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 84 (1st Cir. 2001).  Indeed, most laws,

---

whether the Law somehow chills protected commercial speech.  *See Zauderer v. Off. of Disciplinary Couns. of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985); *United States v. Wenger*, 427 F.3d 840, 851 (10th Cir. 2005).  Plaintiff has not alleged that its purported administrative burdens chill its protected commercial speech.

regulations, and ordinances which require anything from companies (e.g., to post a notice of certain labor laws in a break room) will, in turn, indirectly require them to incur administrative costs in order to comply.  The Commerce Clause does not guarantee employers the right to run their businesses free of administrative costs.

### 2. "The Forced Disclosure Of Confidential Information And Trade Secrets"

There is no absolute protection for trade secrets or similar confidential commercial information.  *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) (cited in *Summit Elec. Supply Co. v. Baan U.S.A., Inc.*, No. CIV 00-378LH/LFG-ACE, No. CIV 00-1511 LH/LFG-ACE, 2001 WL 37125153 (D.N.M. Mar. 22, 2001)).  Instead of giving trade secrets "automatic and complete immunity against disclosure," courts have weighed a given "claim to privacy against the need for disclosure" on a case-by-case basis.  *Id.* (internal citations and quotation marks omitted).

Plaintiff incorrectly argues that all Colorado employers' compensation information should be considered confidential, proprietary, or a trade secret. First, such treatment would be inconsistent with the legal framework for trade secrets.  In Colorado, "the essential test" for whether something "is capable of protection as a trade secret" includes at least six factors, including precautions taken to protect the information and the extent to which it is known outside the business.  *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1108 (10th Cir. 2009) (citing *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)).  Plaintiff

has not provided any evidence, or even articulated sufficient allegations, to show that its members' compensation information is a trade secret.

Second, the cases cited by Plaintiff in support of its argument do not support the proposition that employment compensation should hold a blanket designation as a trade secret or confidential (much less that a salary *range* should automatically be protected as such).  In its supplemental brief and in its Motion for Preliminary Injunction, Plaintiff principally relies on a nonbinding, unreported District of New Mexico case to support its trade secret argument. *See Summit Elec. Supply Co.*, 2001 WL 37125153.  *Summit Electric Supply* was a district court decision on a discovery dispute, where the corporate defendant sought to limit the required disclosure of its "salary and compensation structure" and "compensation plan documents" to the corporate plaintiff's attorneys and outside experts under Fed. R. Civ. P. 26(c)(7).[3]  *Summit Elec. Supply*, 2001 WL 37125153 at *2-3.  There, the court balanced the competing interests of the parties and concluded that, based on the facts of that case, the limited disclosure would serve both parties' interests.  *Id.*  But *Summit Electric Supply* does not stand for the broad proposition that compensation information—much less a good faith estimate of compensation for prospective employees—must always be treated as a trade secret.

---

[3] Indeed, in order to prove entitlement to protection under Fed. R. Civ. P. 26(c)(7), the moving party must set forth specific facts showing good cause, not simply conclusory statements.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981).

Third, Plaintiff's complaint that it is compelled to disclose trade secrets is a claim that a law is depriving it of its property right, which—depending on the facts of the particular case—could potentially be cognizable under the Fifth Amendment takings clause, rather than the First Amendment or dormant Commerce Clause. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001) (explaining that "to the extent commercial speakers have a legally cognizable interest in withholding accurate, factual information, that interest is typically accommodated by the common law of property and its constitutional guarantors"). Thus, even if Plaintiff were to establish that its estimated salary range were a trade secret, that would not support its dormant Commerce Clause argument.

> **3.      "The Requirement To Notify Colorado Employees Of 'Promotional Opportunities'—Including 'In Seat' Promotions—Anywhere In The World, And To Pause Any Hiring Or Promotions Until Such Notice Is Provided"**

Plaintiff contends that promotion posting requirement creates "a global quagmire" for employers and necessitates "a complete overhaul of companies' systems for attracting, retaining, and advancing talent." ECF 35, p. 9. As with the other burdens identified by Plaintiff, these arguments are simply not of a Constitutional dimension. While Plaintiff contends that "[t]he burden on RMAR's members and the corporate clients they serve to comply with this provision is immense," this misses the point: even an "immense" burden on individual companies is immaterial under the Commerce Clause if it is not a burden on interstate commerce. *Instructional Sys., Inc.* 35 F.3d at 827 (3d Cir. 1994) ("the

fact that a law may have devastating economic consequences on a particular interstate firm is not sufficient to rise to a Commerce Clause burden.").

Plaintiff does state that the "Promotion Posting Requirement's impact on the global labor market is immense," ECF 35, p. 11, but this conclusory statement does not explain how or why that is so.  All the burdens identified by Plaintiff are on individual companies.  Plaintiff does not explain *how* the global labor market would be burdened—will there be fewer jobs?  Fewer workers?  Plaintiff does not say.[4]

Additionally, even if this were somehow a burden on interstate commerce, Plaintiff does not show how this burden in any way affects interstate commerce in a manner different from the burden on intrastate commerce.  All entities with Colorado employees will have to disclose promotional opportunities (including in-seat promotions) to their Colorado employees (even theoretically unqualified ones).  So to the extent this could be considered a burden on interstate

---

[4] As with the other identified burdens, Plaintiff's brief makes clear that Plaintiff's argument as to the burdens of the promotion posting requirement is fundamentally a policy one.  For instance, Plaintiff argues that the Law should be invalidated because the promotion posting requirement "seems to have been passed as an afterthought by a legislature that did not give due concern to the ramifications."  ECF 35, p. 10.  Plaintiff also contends that it "would have been very simple for the Legislature or Defendant to limit the requirement to jobs in Colorado or even in the United States," and that the choice "not to do so supports a finding that the requirement fails the *Pike* test."  ECF 35, p. 9.  But these arguments conflate a policy choice with a Constitutional requirement.  Irrespective of whether it would have been simple, the legislature's policy choice only bears on the *Pike* test to the extent the choice impermissibly burdens interstate commerce.  A legislature can always choose to make laws more or less expansive, but the decision not to limit the Law in the manner desired by Plaintiff has no bearing on whether it clearly burdens interstate commerce.  Plaintiff's policy arguments must be directed to the legislature.

commerce, Plaintiff has not identified any burdens on interstate commerce that *exceed* the burdens on intrastate commerce.  As a result, there is no *Pike* balancing to conduct.  *See V-1 Oil*, 131 F.3d at 1425 ("The incidental burdens of the *Pike* inquiry are the burdens on interstate commerce that exceed the burdens on intrastate commerce.").

And finally, Plaintiff's identified burden is supported by only broad generalizations.  Even if this burden could be cognizable, then, there is no evidence with which the Court can attempt to weigh or balance this burden.  Generalized allegations like "global quagmire" and "immense burden" make it "impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits."  *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1043–44 (10th Cir. 2009) (also explaining that, while "exact figures are not essential...it takes more than lawyers' talk to condemn a statute under *Pike*.").  As a result, even if there were a reason to factor this burden into a *Pike* test, the Court is left with nothing tangible to actually weigh, and thus the identified burden cannot possibly outweigh the putative local benefits.

### 4.   "The Lack Of Exceptions For Trade Secret Disclosures, Confidential Searches, And Corporate Mergers And Reorganizations."

This identified burden fails for the exact same reasons.  As described by Plaintiff, it is entirely about logistical difficulties: the promotion posting requirement forces disclosure of "hiring opportunities that reveal confidential business strategies"; recruiters will "feel the pinch of the effective elimination of the confidential search process" in the form of lost revenue; postings brought

about by a hypothetical merger "would be confusing to employees…."  ECF 35, pp. 12-13.  And ultimately, "the lack of exceptions…renders the requirement unduly burdensome for RMAR's members and businesses at large."  ECF 35, p. 13.

As Defendant has explained at length, operational burdens on individual businesses cannot be conflated with impermissible burdens on interstate commerce.  Every tax or regulatory measure burdens entities in some manner, but only those that clearly burden interstate commerce are impermissible under the dormant Commerce Clause.[5]  And without a clear connection between the operational burdens identified by Plaintiff to burdens on the national labor market, there is nothing to weigh in *Pike* balancing.

Indeed, it is notable that nowhere in the section on "the lack of exceptions" (*i.e.*, ECF 35, pp. 11-13) does Plaintiff even state that, let alone explain *how*, this burden is an impermissible burden on interstate commerce.  Instead, Plaintiff's entire argument is that it is "unduly burdensome for *RMAR's members and businesses at large*."  ECF 35, p. 13 (emphasis added).  But if those burdens

---

[5] Plaintiff's repeated reference to forced disclosure of alleged "trade secrets" does not alter the dormant Commerce Clause analysis in any appreciable way. Because the dormant Commerce Clause is focused exclusively on burdens on interstate commerce, it is immaterial to the Commerce Clause analysis whether a law forces disclosure of trade secrets.  So while Plaintiff has put forth no evidence to suggest that the promotion posting requirement in fact *does* force disclosure of trade secrets, even assuming it does, Plaintiff's recourse lies in the Fifth Amendment.  Merely labeling something a "trade secret" or "confidential business strategy" cannot serve to place any additional weight upon the burden side of the *Pike* balancing scale.

result in any impact on the national labor market (*e.g.*, fewer overall jobs or fewer overall job seekers), Plaintiff has not said how.[6]

Additionally, as with the other identified burdens, this one again primarily falls on in-state entities, or at most, falls equally on in-state and out-of-state entities.  All entities with Colorado employees will have to disclose promotional opportunities to their Colorado employees without the exceptions demanded by Plaintiff.  So to the extent this could be considered a burden on interstate commerce, Plaintiff has again not identified any burdens on interstate commerce that exceed the burdens on intrastate commerce.  As a result, there is no *Pike* balancing to conduct.  *See V-1 Oil*, 131 F.3d at 1425.

And, finally, the extent of this burden identified by Plaintiff is again bereft of any specifics.  Even if it could be a cognizable burden, then, there is no evidence with which the Court can attempt to weigh or balance this burden.  Generalized allegations like a "significant and permanent impact of hundreds of businesses in Colorado that engage in recruiting and search work" and "confus[ion] to employees" make it "impossible to tell whether a burden on

---

[6] Plaintiff's failure to connect this identified burden to interstate commerce in any concrete manner underscores again how its argument is less a Constitutional argument and more an entreaty to this Court to assume a super-legislative role and simply reconsider the policy issues properly before the legislature.  For instance, Plaintiff contends that the Colorado General Assembly neither "understood the problem or gave due consideration to the impact of the law," "overlooked" exceptions requested by Plaintiff's counsel, and imposed burdens that may "be confusing to employees," and that the Division failed to implement "significant and necessary exceptions" requested by Plaintiff.  Those are policy arguments, and they must be directed to the Colorado General Assembly because courts are loath to "reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007).

interstate commerce is clearly excessive in relation to the putative local benefits."
*See Kleinsmith*, 571 F.3d at 1043-44.  As a result, even if there were a reason to
factor this burden into a *Pike* test, the Court is left with nothing tangible to
actually weigh, and thus the identified burden cannot possibly outweigh the
putative local benefits.

### C.      The Counterweight: Putative Local Benefits.

As for the other side of the scale, the putative local benefits advanced by
the Law are clear: "help[ing] to close the pay gap in Colorado and ensur[ing] that
employees with similar job duties are paid the same wage rate regardless of sex,
or sex plus another protected status."  S.B. 19-85, Colorado Equal Pay for Equal
Work Act, 2019 Colorado Session Laws, Ch. 247, § 2(1) (Legislative
Declaration).  And it is crucial to recall that, when conducting *Pike* balancing, it is
these *putative* local benefits that matter.  Putative means: "Reputed; believed or
supposed by most people."  *Black's Law Dictionary*.  Just as putative damages,
then, are "[d]amages that are alleged; claimed but unproved damages," *id.*, so
too putative local benefits are the *claimed* benefits.  Thus a plaintiff cannot simply
argue that the benefits do not exist or are unlikely to be realized in an attempt to
unweight the benefits side of the scale, as Plaintiff does here.  This is because,
"under *Pike*, it is the *putative* local benefits that matter. It matters not whether
these benefits actually come into being at the end of the day."  *Pharm. Care
Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312-13 (1st Cir. 2005) (emphasis in
original).

Plaintiff misconceives both sides of the scale under *Pike* balancing.  The
test Plaintiff urges on the Court and the actual *Pike* balancing test are

fundamentally different.  *Pike* balancing involves weighing (1) burdens on interstate commerce against (2) putative local benefits.  *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).  Only if the former *clearly* outweigh the latter can a Plaintiff prevail.  *Id*.  Plaintiff's test, while labeled as *Pike* balancing, in fact asks the Court to weigh (1) generalized burdens on particular companies (which Plaintiff insists, with little evidence, will be great) against (2) the actual future benefits of the Law (which Plaintiff insists, without evidence, will be zero).

While perhaps Plaintiff could prevail under *that* balancing test, it is critical to understand that Plaintiff's test is *not* the *Pike* balancing test, at least in the way that any court has understood it.  Plaintiff's test is better understood as a request that the Court act as a super-legislature and weigh burdens on companies against the likelihood of achieving a particular policy goal.  The Colorado legislature has already done that.  As a result, the Court should decline Plaintiff's invitation to invalidate the Law and should deny the Motion for Preliminary Injunction.

## II.    The legislative history supports a conclusion that the Law is constitutional.

Statutes and administrative regulations are presumed valid and constitutional, and the burden is on the party attacking such statutes and regulations to show their invalidity beyond a reasonable doubt.  *Colo. Civil Rights Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1366 (Colo. 1988); *Renteria v. Colo. State Dep't of Personnel*, 811 P.2d 797, 799 (Colo. 1991); *see* § 2-4-201 (when the Colorado General Assembly enacts a statute, it is presumed to intend compliance with the constitutions of the state of Colorado and the United States).

Whenever it is reasonable and practical, "a statute must be construed in a manner consistent with the constitutional requirements." *Renteria*, 811 P.2d at 799.  Even when a statute is potentially susceptible to both constitutional and unconstitutional interpretations, courts must "adopt the constitutional interpretation of the statute." *Id.*  A law does not have to be perfect in order to be constitutional.  *Table Servs., LTD v. Hickenlooper*, 257 P.3d 1210, 1216-17 (Colo. App. 2011) ("Just because a law *could* have been drafted with greater precision does not mean it is invalid.").  A statute also is not invalid simply because other states have done it differently.  *Id.* Here, Plaintiff does not allege there was any deficiency in the inherent constitutionality or the legality of the legislative or rulemaking process that resulted in the Law.

Likewise, rules promulgated by an agency are presumed to be valid, and a challenging party has the burden of showing that a rulemaking body has exceeded its statutory authority.  *Table Servs.*, 257 P.3d at 1217.  "An agency's interpretation of its governing statutes and constitutional provisions is entitled to great deference, and a reviewing court may not substitute its judgment for that of the agency." *Id.*; *see also Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n*, 157 P.3d 1083, 1088 (Colo. 2007).  Courts generally accept an agency's statutory interpretation if the agency has been charged with the statute's administration, and the interpretation has a reasonable basis in the law and the record.  *Table Servs.*, 257 P.3d at 1217.  Courts also may not substitute their judgment for that of a state agency charged with enforcement of a law simply because a party challenging the agency's regulations suggests an alternative way to draft the

regulations.  *Id.* at 1218; *see Freedom Colorado Information, Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 900 (Colo. 2008) ("The reviewing court should not substitute its judgment for that of the agency[] when the General Assembly by statute has consigned the matter to the exercise of the agency's sound discretion.").

Here, the Division of Labor's public rulemaking process and the accompanying procedural safeguards guarded against an "arbitrary or unbridled exercise of agency discretion in applying and enforcing the provisions" of the Law.  *See Stamm v. City and Cnty. of Denver*, 856 P.2d 54, 57 (Colo. App. 1993) (citing *Electron Corp. v. Wuerz*, 820 P.2d 356, 357-58 (Colo. App. 1991)).  A stakeholder's unhappiness with the Division's decision not to accept its position does not equate with an absence of such procedural safeguards.  *Table Servs.*, 257 P.3d at 1216.  The fact that Plaintiff "participated in the public rule-making proceedings" that gave rise to the regulations at issue here further supports the validity of the process.  *See id*.

The Colorado Senate Judiciary Committee heard over three hours of testimony in support of and opposed to S.B. 19-85.  Sen. Judic. Hrg. Over 20 individuals, many of whom were subject matter experts, testified in support of the Law at that hearing. *Id.*; *see Hearing Transcript*, Exh. 3 to Plaintiff's May 6, 2021 Supplemental Brief ("ECF 35, Exh. 3").  Charlotte Sweeney, an attorney with the Colorado Women's Bar Association ("CWBA"), testified that the CWBA had worked with a coalition of proponents (including employer-side defense attorneys) for 8 years, compiling social, economic, and governmental research to

develop a comprehensive bill that would close "the main loophole in the federal Equal Pay Act which allows an employer to come up with any factor whatsoever to justify a pay disparity."  ECF 35, Exh. 3, pp. 10:11 – 12:2.

Numerous witnesses from different industries testified that compensation transparency would have alerted them to the fact that they were being paid less than their male counterparts (or even their male subordinates).  For example, Professor Catherine Smith of the University of Denver, Sturm College of Law, testified that years—even decades—went by before women law professors learned that they were being paid significantly less than male law professors. ECF 35, Exh. 3, pp. 27:12 – 28:14.  Professor Smith testified that the employer's secrecy about compensation prevented the affected professors from learning about the pay disparity for many years, which meant that even though they filed a lawsuit, many of them would never be able to recover what they had lost.  ECF 35, Exh. 3, p. 28:10 – 22.  Professor Smith testified that requiring pay transparency would ensure that employers did not have a "powerful lock on information that prevents people from being able to ask questions and interrogate and identify pay disparities and do something about it."  ECF 35, Exh. 3, p. 32:2 – 7.

Judith Marquez, a Senior Organizer with 9to5 Colorado, testified that research showed that employers had unconscious biases that caused gender-based pay disparities, and that the salary posting provision was a tool that would reduce these unconscious biases.  ECF 35, Exh. 3, pp. 42:24 – 43:19.  Ms. Marquez further testified that, based on a report by the National Women's Law

Center, "a culture of secrecy around pay is bad for business not only because it gives cover to discrimination, but also because it leads to poor performances, employee dissatisfaction, and lower motivation and mistrust of management." ECF 35, Exh. 3, p. 43:20 – 25. She testified that "pay transparency would allow workers to discuss compensation, provide employees with information about the pay scale and pay . . . practices, increase the likelihood that employees will believe they are being paid fairly which, in turn promotes employee engagement and productivity." ECF 35, Exh. 3, p. 44:1 – 7.

Employers also testified in favor of S.B. 19-085. Katharine Knarreborg, a small business owner, testified that the "bill addresses many of the root causes of pay inequity so that as businesses we all are implementing hiring and employment practices that have been shown to close the pay gap." ECF 35, Exh. 3, pp. 50:24 – 51:2. She further testified that "[s]mall businesses like mine need this direction and a level playing field for hiring. If all businesses list salary ranges and job postings and don't rely on pay history to determine a wage, then no busines has a hiring advantage." ECF 35, Exh. 3, p. 51:3 – 7. Ms. Knarreborg testified that if "employees at all businesses can discuss their wages and take legal action if they discover they are paid unfairly, then all businesses are motivated to take a look at their pay and correct any inequities . . . ." ECF 35, Exh. 3, p. 51:8 – 12. She testified that the bill would require businesses to make "small changes [that] are manageable and 100 percent worth it for the benefit this bill will have." ECF 35, Exh. 3, pp. 51:22 – 52:5.

The testimony offered in favor of S.B. 19-085 is supported by recent research.  *See, e.g.*, Aman Kidwai, *Pay transparency can address gender wage gap better than alternatives, study finds*, HR Dive (Jan. 6, 2021), https://www.hrdive.com/news/pay-transparency-can-address-gender-wage-gap-better-than-alternatives-stud/592850/; Michael Baker, Yosh Halberstam, Kory Kroft, Alexandre Mas, and Derek Messacar, *Can Transparency Laws Fix the Gender Wage Gap?*, Harvard Business Review (Feb. 26, 2020), https://hbr.org/2020/02/can-transparency-laws-fix-the-gender-wage-gap; Lisa Burden, *Mandatory wage reporting shrinks gender-based pay gaps, study shows*, HR Dive (Feb. 1, 2019), https://www.hrdive.com/news/mandatory-wage-reporting-shrinks-gender-based-pay-gaps-study-shows/547107/; Maria Recalde and Lise Vesterlund, *Gender Differences in Negotiation and Policy for Improvement*, National Bureau of Economic Research (Dec. 2020), *attached as* Exhibit A.  The research discussed in these articles shows that pay transparency (including government-mandated disclosures) narrows the gender-based pay gap.  Burden, *supra*; Baker, Halberstam, Kroft, Mas, and Messacar, *supra*. Research also shows that pay transparency rules that target employers are more effective than measures that attempt to change how women negotiate.  Kidwai, *supra*.

In their working paper, Maria Recalde and Lise Vesterlund argue that the policies that are the most effective in narrowing gender disparities were those that increase transparency.  Exh. A, p. 2.  According to Recalde and Vesterlund, "[n]umerous studies find that gender differences in negotiation diminish when it is

clear what to expect from the negotiation and suggest that initiatives which improve transparency are likely to help equalize opportunities at the bargaining table."  Exh. A, p. 2.  The research pointed to a number of factors that affect gender differences in negotiation.  Exh. A, p. 4.  Research further showed that such "[d]ifferences are less pronounced when it is clear that something is negotiable and what the bargaining range is."  Exh. A, p. 4.

Plaintiff's argument that nothing supports the General Assembly's approach to reducing the gender-based pay gap is belied by the legislative history and current research.  The legislative process underlying the Law was valid and allowed for both proponents and opponents to offer evidence regarding the effect of the Law.  The legislative record is filled with evidence showing how the compensation posting and promotion posting requirements will help close the pay gap.  That evidence was supported by research showing that institutional biases need to be addressed in order to close the pay gap.

Respectfully submitted this 17th day of May, 2021.

PHILIP J. WEISER
Attorney General


*/s/ Krista Maher*
*John August Lizza*, 14771
First Assistant Attorney General
*Krista Maher*, 42140
Senior Assistant Attorney General
*Evan P. Brennan*, 49887
Assistant Attorney General
Office of the Colorado Attorney General
State Services Section
1300 Broadway, 6th Floor
Denver, CO  80203

Telephone:  720.508.6158, 720.508.6184,
  720.508.6161
john.lizza@coag.gov
krista.maher@coag.gov
evan.brennan@coag.gov

Attorneys for Defendant Scott Moss

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing **RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF** upon all parties herein by e-filing with the CM/ECF system maintained by the court, or by electronic mail, or by depositing copies of same in the United State mail, first-class postage prepaid, at Denver, Colorado, this 17th day of May, 2021, addressed as follows:

Joshua B. Kirkpatrick
Jennifer S. Harpole
Grace L. McGuire
Littler Mendelson, P.C.
1900 16th Street, Suite 800
Denver, CO 80202
jkirkpatrick@littler.com
jharpole@littler.com
gmcguire@littler.com

/s/ *Theresa Damon*
  *Original signature on file at the Colorado*
  *Attorney General's Office*

21